UNITED STATES of America, Plaintiff–Appellee,

v.

Kim M. BUCKLEY and Mark R. Herman, Defendants–Appellants.

Nos. 92–3849, 92–3869.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1993.

Decided Sept. 14, 1993.

Timothy O'Shea, Office of the U.S. Atty., Madison, WI, for U.S.

Reesa Evans, Madison, WI, for Kim M. Buckley.

Bonnie Musial, Julian, Musial, Wettersten & Friedrich, Madison, WI, for Mark R. Herman.

Before BAUER, Chief Judge, and MANION and ROVNER, Circuit Judges.

MANION, Circuit Judge.

Kim Buckley and Mark Herman lived in a mobile home where they grew marijuana and distributed cocaine. Pursuant to a search warrant, the police gathered overwhelming evidence of guilt. The defendants pleaded guilty and reserved several issues for appeal—arguing the search warrant was not supported by probable cause, the search exceeded the scope of the warrant, the police failed to knock and announce, and that certain incriminating statements made after their arrest were involuntary and taken after invoking the right to counsel. The district court denied the motions to suppress, and we affirm.

## I. Background

On April 2, 1992, Don Bates, a Fitchburg, Wisconsin police officer, applied for a search warrant. A Dane County circuit court judge signed the warrant based on information provided by a confidential informant, now known as Karen Wickline. The application for the warrant stated as follows. Wickline regularly purchased cocaine from the defendants and had seen firearms inside the trailer. She admitted obtaining cocaine from the defendants at least twenty-five times in the previous six months. She saw cocaine lying around the trailer as well as a triple beam scale and packaging materials. Apparently, Herman was also a hunter who kept firearms within view. Wickline had gone recently to the defendants' residence where they had shown her a number of marijuana plants growing in the spare bedroom. They were about a foot high, with fluorescent lights and fans in the room. Officer Bates knew from his experience that such lighting and ventilation aided the marijuana production process. He stated that Wickline had provided him with a total of fifteen pieces of information that he had corroborated by independent means. The judge signed the search warrant for the defendants' mobile home.

The following day Wickline again purchased cocaine and associated paraphernalia from the defendants, this time at Officer Bates' direction. The police officers planned to search the mobile home later that evening. At approximately 8:00 p.m., Officer Bates approached the home carrying a "catch pole." He was assigned to catch the defendants' pet, a pit bull named "Boomer." Six other officers lined up behind the front door; only one was in uniform. A total of fourteen officers were involved in executing the warrant. According to Officer Bates, he knocked two or three times on the door, Buckley opened it, and Officer Bates said in a moderate voice (hoping not to arouse the pit bull), "Police, search warrant," and then he hit the door open with his left hand. Officer Bates captured the dog and arrested the defendants without incident. After an initial walkthrough of the premises, Officer Bates discovered the marijuana growing in the spare bedroom as expected, and a small bag of powder on the bed, later determined to be about an ounce of cocaine.

Officers Bates and Richard Pharo used the trailer's bathroom to talk to the defendants while the other officers executed the search. It was about six feet square, with a washer and dryer, toilet, sink and tub, and included traversable floor space of about two feet by four feet. The officers told the defendants that if they cooperated, the prosecutor would be so informed. They also discussed the possibility of the defendants not going to jail that night, depending on their cooperation. Herman stated "I don't know if I need an attorney," to which the officers responded by asking Herman if he wanted an attorney, or if he had an attorney in mind, to which Herman responded "No." Herman testified that he only answered questions based on the

officers' proposed "deal" of not taking him to jail.

After this colloquy, Officer Bates read Herman his *Miranda* rights, and Herman responded that he understood them. Officer Bates then asked Herman if he wished to waive these rights and speak to the officers without an attorney present, to which Herman responded, "Yes, I'll talk to you." The officers brought defendant Buckley, who had been waiting nearby, into the bathroom and followed the same routine. Buckley stated that she understood her *Miranda* rights and was willing to talk to the officers without an attorney present. Shortly thereafter, the defendants asked to speak with each other alone. The officers agreed and stepped out into the hallway, leaving the bathroom door slightly ajar. Officers Bates claims that he heard Herman say that he was not sticking around for federal charges. After a few minutes the officers re-entered the bathroom and continued their questioning, including the topic of cooperation and not going to jail that night.

After Officer Bates had found the small bag in his initial walk-through, Herman told the officers that this was the only cocaine in the residence. Unbeknownst to the defendants, the officers had reason to believe that the defendants had up to a kilogram of cocaine on the premises (although this was not mentioned in the search warrant application). Whatever deal Officers Bates and Pharo and the defendants might have arranged was cut short when other officers discovered nearly a kilogram of cocaine behind the door of the master bedroom. When asked why he lied about the amount of cocaine, Herman responded "I don't know." The interview had lasted approximately thirty minutes; within the hour the defendants were in jail.

Wisconsin turned the defendants over to federal authorities for prosecution. They were charged with various drug and firearm offenses. After a total of twelve briefs on the issues, a magistrate judge recommended denial of the defendants' motions to suppress, which the district court adopted.[1] On the condition that the motion to suppress

issues would be preserved on appeal, Herman pleaded guilty to possession of cocaine with intent to distribute and using a firearm during and in relation to a drug trafficking crime. He was ultimately sentenced to 92 months on the drug charge and a consecutive 60 months on the firearms offense. Buckley also conditionally pleaded guilty to possessing cocaine with intent to distribute and received a 78 month sentence. On appeal, they renew arguments for suppressing the evidence procured under the search warrant, including no probable cause, exploratory rummaging, the officers' failure to properly knock and announce their entry, and that certain incriminating statements made after arrest were involuntary and taken after having invoked their right to counsel.

## II. Discussion

### A. Whether Probable Cause Supported the Warrant

■ The Fourth Amendment protects people from unreasonable searches in part by requiring that search warrants be supported by probable cause. In this case a Dane County circuit court judge found that sufficient probable cause existed to search the defendants mobile home. He found the confidential informant credible and believed that the defendants were growing marijuana at that location. We review such findings for clear error. *United States v. Adebayo*, 985 F.2d 1333, 1337 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993); *United States v. Soria*, 965 F.2d 436, 439 (7th Cir.1992); *United States v. Spears*, 965 F.2d 262, 270 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992).

The government argues that the informant provided very detailed information concerning the defendants' illegal activities. Wickline had visited the residence and seen cocaine, a triple beam scale used to weigh the cocaine, packaging materials, a growing operation for marijuana plants and the defendants smoking marijuana cigarettes. Such first-hand observations support a finding of

---

1. The magistrate judge recommended that the defendants' business records be suppressed, which the district court adopted and the government has not contested.

reliability. *See Illinois v. Gates*, 462 U.S. 213, 234, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983) ("even if we entertain some doubt as to an informant's motives, [her] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first hand, entitles [her] tip to greater weight than might otherwise be the case"); *see also United States v. Church*, 970 F.2d 401, 404 (7th Cir.1992), *cert. denied*, ⎯ U.S. ⎯, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993); *United States v. Pless*, 982 F.2d 1118, 1125 (7th Cir.1992); *United States v. McKinney*, 919 F.2d 405, 415–16 (7th Cir.1990).

The defendants respond that the circuit court judge had no details whatsoever concerning the fifteen pieces of information Officer Bates supposedly verified. Granted, Officer Bates did not specify to the judge the fifteen pieces of information that Wickline had provided, nor how he had corroborated that information by independent means. Credibility, however, is a matter of the totality of the circumstances. *Gates*, 462 U.S. at 234, 103 S.Ct. at 2330; *United States v. Skinner*, 972 F.2d 171, 174 (7th Cir.1992). Wickline's credibility increased when she admitted regularly purchasing cocaine from the defendants. *See United States v. Harris*, 403 U.S. 573, 587, 91 S.Ct. 2075, 2084, 29 L.Ed.2d 723 (1971); *United States v. Barnes*, 909 F.2d 1059, 1069 (7th Cir.1990) (admission against penal interest).

The defendants argue that Wickline did not speak against her penal interests because she was given immunity for her illegal acts. Officer Bates had initially pulled over Wickline for a traffic violation which led to the discovery of cocaine. Regarding events subsequent to the traffic stop she testified at trial on cross examination as follows:

Question: [D]id he also tell you that if you helped him, you wouldn't get charged for this?

Answer: No, he did not.

Question: So why did you help him?

Answer: He told me he would tell that I cooperated with him.

Question: So you expected to get his assistance if you helped him?

Answer: Well, it looked better for me to have worked with the cops.

Question: Is that what he told you or that's what you decided?

Answer: That's what I decided.

Question: And you've since been given letters of immunity, right?

Answer: No.

Question: You haven't been given a letter of immunity? Have you been told you won't be prosecuted for testifying about any drug involvement of you and your husband?

Answer: Yes.

At oral argument the government asserted that Wickline did not receive a letter of immunity until after the defendants were sentenced. The government drafted the letter supposedly in response to Wickline's employer's concerns after hearing about her testimony. Apparently, she testified solely under the Assistant United States Attorney's oral promise not to prosecute her for her testimony. The defendants disputed this. They argued that copies of the immunity letters were given to defense counsel the Friday before the scheduled trial and during plea negotiations. Unfortunately, the record does not contain any letter(s) of immunity. Buckley cites the immunity letter in her reply brief as docket number 132. That is a sealed exhibit concerning only an application for a writ of habeas corpus.

Although we are concerned at the possibility that either the government or the defendants are not properly informing this court, we need not delay these proceedings by investigating the matter. For the search warrant to be supported by probable cause, Wickline must have spoken against her penal interests at the time she admitted to Officer Bates that she purchased cocaine from the defendants. Her testimony at trial supports just that. Whether she was later given immunity from prosecution for such illegal acts before trial, at plea negotiations (as the defendants contend) or after the sentencing hearing (as the government contends), matters not. Because Wickline told Officer Bates that she had purchased cocaine from the defendants, the circuit court properly

considered her testimony when issuing the warrant. *Barnes,* 909 F.2d at 1069.

■ Lastly, the defendants argue that the government should not have seized the firearms. The officers knew that the defendants possessed firearms at least for hunting purposes. The officers also did not know when they executed the warrant that Herman was a previous felon, such that possessing the firearms would be unlawful. The defendants contend that because the reason for such possession was apparently lawful, there was no reason to seize the weapons. We reject such syllogism. *See United States v. Buchanan,* 910 F.2d 1571, 1573 (7th Cir.1990) ("guns are the tools of the drug-dealing trade"). As noted at oral argument, even hunters have been known to shoot people. If a drug dealer happens also to be a hunter, he does not receive a dispensation as a felon in possession of guns he apparently uses for hunting. The officers acted appropriately in seizing the firearms, if only to keep such evidence secure until their effect could be determined. Finding Wickline credible, her information relating to the drugs and firearms supported the circuit court judge's determination that probable cause existed, justifying the search warrant.

## B. Scope of the Warrant

■ The Fourth Amendment requires search warrants to describe with particularity those items to be seized. General search warrants leave too much discretion to the officers. *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). The defendants assert that the search in this case violated the rule against exploratory rummaging, requiring suppression of all of the evidence collected.

The warrant permitted the officers to search for marijuana and any other controlled substance, paraphernalia, buyers' and sellers' lists, money, firearms and documents tending to prove custody of the premises, including utility bills, rent receipts, personal correspondence and telephone bills. To effect the warrant, the officers admit that they went through the residence with a fine tooth comb.[2] We agree with the magistrate judge's findings that the items seized were within the scope of the warrant. This is not a case where the officers rummaged throughout the residence not knowing what they were looking for. *See United States v. Nafzger,* 965 F.2d 213, 215 (7th Cir.1992). They knew exactly what they wanted. Where a warrant permits the search for firearms, the officers need not stop just because they found one. Likewise, officers in search of marijuana and "other controlled substances" certainly would not be expected to put the cocaine back where they found it.

■ Even if we were to find that the officers exceeded the scope of the warrant, the defendants would not succeed on this issue. They argue specifically that certain items such as jewelry, a telephone book and a vehicle title exceeded the scope of the warrant. They claim these "errors" would be enough to suppress the primary evidence against them, namely the cocaine and marijuana plants. They cite *United States v. Rettig,* 589 F.2d 418, 422–23 (9th Cir.1978), for the proposition that where officers conduct too general a search, the court must suppress all evidence seized. We do not share their expansive reading of *Rettig.* There, where the agents substantially exceeded the provisions of the warrant, the court suppressed all of the evidence because

2. The officers seized a police scanner, a piece of paper on which police department radio frequencies were listed, a strainer, a box and five bags containing suspect marijuana and residue, a plastic tray, a travel itinerary, $82 cash, one blank check showing that Buckley lived in the mobile home, a box of financial records and two small checks for Badger Towing Company (while not running drugs, Herman ran Badger Amusement Company and Badger Towing Company), an insurance card, information on a 1966 Corvette, six long guns, a scope, two pistols, ammunition, an air gun, a nunchaku (a martial arts weapon), a pager and mobile telephone, a bag containing cocaine residue, a bank filled with nickels, a bag of parlay cards, various boat, trailer and car titles, an address book, jewelry, an electric and a hand-made scale, a bag containing two empty bottles and one full bottle of inositol (a cocaine cutting agent), a slot machine, five pieces of equipment used for plant growing, a bag of light bulbs, twenty-five dirt containers, five marijuana plants, bags of cocaine containing 25 and 869 grams, pipes, screens, rolling papers and a Ford Escort station wagon.

it was "not possible for the court to identify after the fact the discrete items of evidence which would have been discovered had the agents kept their search within the bounds permitted by the warrant." *Id.* at 423. If the defendants in this case wish for suppression of all of the evidence, they must assert that all of the evidence was beyond the scope of the warrant. The seizure of uncontested evidence remains valid and is "severable from any invalid search." *United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984). Aside from our conclusion that seizure of the guns and cocaine was valid, all other items seized in the search were clearly within the scope of the warrant.

### C. Knock and Announce

■ The defendants present this court with varying accounts of what the officers said and did before entering the trailer. We need not delve into the specifics. In his very thorough analysis the magistrate judge found and the district court agreed that defendant Buckley opened the door in response to Officer Bates' knock.[3] That finding was not clearly erroneous. In any event, this case would have justified a no-knock entry.

■ In the normal execution of a search warrant, the Fourth Amendment and, more specifically, 18 U.S.C. § 3109, requires officers to knock and announce their presence before entering a dwelling. This requirement is not absolute; exigent circumstances may exist. If, in the officers' reasonable judgment, knocking or announcing their presence would jeopardize the recovery of important evidence or heighten the risks to their personal safety, *see United States v.*

*Singer,* 943 F.2d 758, 762 (7th Cir.1991), the officers may enter without alerting the occupants. *Soria,* 965 F.2d at 439; *see United States v. Barrientos,* 758 F.2d 1152, 1159 (7th Cir.1985), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986). In this case the officers knew that the defendants possessed a pit bull and firearms. If they chose to knock and announce their presence, as they so testified and as the magistrate judge so found, so much the better. But exigent circumstances certainly existed to excuse any requirement of arousing armed defendants, or their dog.[4]

### D. Right to Counsel

■ Once an accused requests that an attorney be present before questions continue, the police must cease interrogation until the accused enjoys the availability of counsel (unless the accused initiates further communication with the police). *See Edwards v. Arizona,* 451 U.S. 477, 487, 101 S.Ct. 1880, 1886, 68 L.Ed.2d 378 (1981). The court must look to whether the defendant's words or actions reasonably requested such assistance. *United States ex rel. Espinoza v. Fairman,* 813 F.2d 117, 124 (7th Cir.), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 745 (1987).

■ The defendants in this case argue that the magistrate judge committed plain error by discrediting the defendants' version of events and believing the police officers. We leave such credibility determinations to the judge's experience in sorting out the true facts. At one point during their discussions, Herman stated to Officer Pharo, "I don't know if I need an attorney." The officers

---

**3.** In their reply brief and at oral argument the defendants asserted for the first time that the mobile home had two doors: an outside screen door and a solid one. They now argue that Officer Bates unlawfully opened the screen door without knocking or announcing. We will not entertain such a late argument. Neither Officer Bates, the magistrate judge nor the district court judge were given the opportunity to address the matter, so neither will we. *See Brookins v. Kolb,* 990 F.2d 308, 316 (7th Cir.1993); *Textile Banking Co. v. Rentschler,* 657 F.2d 844, 853 (7th Cir.1981).

**4.** In her reply brief, counsel for Buckley states that *United States v. Howard,* 961 F.2d 1265 (7th

Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 236, 121 L.Ed.2d 171 (1992), "note[s] that circumstances existing 24 hours prior to the execution of a warrant cannot be the basis for exigency at the time of execution." This reference clearly misrepresents *Howard. Howard* "notes" the 24-hour time period in discussing a case from another circuit, *United States v. Stewart,* 867 F.2d 581 (10th Cir.1989), and then only to reject it as the law in this circuit. In *Howard* we entertained a similar argument that Buckley makes in this case and stated "This argument reads *Stewart* far too broadly and would impose an unrealistic burden on law enforcement officers." *Howard,* 961 F.2d at 1268.

did not interpret this as a question to them; rather, they thought Herman was just thinking out loud. Even so, Officer Pharo responded by asking Herman *if he wanted an attorney, or if he had an attorney in mind,* to which Herman responded "No." Granted this is a compound question, perhaps a little confusing to someone exposed to possible arrest. Any confusion, however, was mitigated by Officer Bates soon thereafter reading Herman his *Miranda* rights, which Herman claimed to understand. Officer Bates asked Herman if he wished to waive these rights and speak to the officers without an attorney present, to which Herman responded, "Yes, I'll talk to you." The officers brought defendant Buckley, who had been awaiting nearby, into the bathroom and followed the same routine. Buckley stated that she understood her *Miranda* rights and was willing to talk to the officers without an attorney present.

Based on these facts, the defendant's words cannot reasonably be construed to request the assistance of counsel. When Herman stated the magic word "attorney," the officers quickly sought to clarify what Herman wanted and read him the full array of protections he was afforded under *Miranda.* Herman's words cannot reasonably be construed as saying "I want a lawyer." If anything, the record shows that the defendants desired to cooperate with the officers in the hope of not going to jail that night.

### E. *Voluntariness of Incriminating Statements*

■ The defendants wish to suppress certain statements made to police officers during the search. Statements will be adjudged voluntary if the government proves by a preponderance of the evidence that under the totality of the circumstances it secured the statements without intimidation. *United States v. Haddon,* 927 F.2d 942, 945 (7th Cir.1991). The question is whether the police acted coercively. *See Colorado v. Connelly,* 479 U.S. 157, 166–67, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986); *United States v. Fazio,* 914 F.2d 950, 955 (7th Cir.1990).

■ Herman claims that the officers improperly induced him into incriminating him-

self by promising him freedom from prosecution if he cooperated. The magistrate judge found just the opposite, and stated that

> Herman was not induced to cooperate by promises that the officers did not keep. At most, he was promised a night at a hotel to continue active cooperation, which never materialized.... I infer that the officers lost their taste for dealing with Herman after they discovered the kilo of cocaine in the bedroom that he failed to tell them was present, and once they suspected that he intended to flee.

The district court also found the officers' testimony more credible than the defendants'. The court found that even Herman's version of the events was illogical. At the time the officers supposedly promised immunity for cooperation, they "would have known both that the defendant Herman was a significant player in the drug trade *and* that he was not someone who could be trusted to tell the truth."

We review these findings for clear error. *United States v. Chrismon,* 965 F.2d 1465, 1470 (7th Cir.1992). We see none. While talking to the officers, Herman had maintained that the mobile home housed only the small, ounce-sized packet of cocaine Officer Bates discovered on his initial walk-through. Given that the officers found a kilogram of cocaine behind the bedroom door, it was Herman, not the officers, who was hopefully "coercing" a promise of immunity for cooperation. *See United States v. Long,* 852 F.2d 975, 980 (7th Cir.1988) (Easterbrook, J., concurring) (where the defendant is induced to confess, the court should inquire into whether "both sides are truthful and the state keeps its word."). To the extent that the officers merely considered informing the government about Herman's cooperation, his statements would not be deemed involuntary. *See United States v. McGuire,* 957 F.2d 310, 315 (7th Cir.1992); *United States v. Oglesby,* 764 F.2d 1273, 1278 (7th Cir.1985).

The defendants argue that the officers knew before entering the mobile home that it housed a kilogram of cocaine. But nothing prevents them from negotiating with Herman until the cocaine was actually discover-

ed. In fact, this argument bolsters the government's case. It shows that the officers would not have considered making any kind of "deal" with the defendants without knowing whether the residence indeed contained a kilogram of cocaine. Under the circumstances, we conclude that the police acted without intimidation and that Herman's statements were voluntary.

Buckley complains that the officers called her a liar, the bathroom was small and crowded, and that she was intimidated by the number and actions of the police.[5] The magistrate judge and the district court concluded that she voluntarily answered the officers' questions. Specifically, the magistrate judge found that Buckley became terrified when the officers entered the trailer to execute the search warrant. Although she claims that witnessing the officers' treatment of Herman also affected her, "[s]he seemed more concerned about her dog than Herman, though, and [Officer] Bates allowed her to assist him in placing the pit bull outside on its leash." She was allowed to smoke, use the restroom facilities and meet privately with Herman. The officers read her her *Miranda* rights, which she said she understood. The magistrate also found that "She is not a weak person ... [T]he officers went out of their way to accommodate Buckley's needs." They spoke with her for no more than fifteen minutes, and "she said she would do whatever Herman did."

In determining whether the officers have coerced the defendant, the court should consider "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The record does not contain Buckley's age, education or intelligence. The only indication of her experience with police was the magistrate mentioning that she had not been previously convicted of a crime. The officers advised her of her constitutional rights and questioned her for only fifteen minutes. Although the magistrate avoided any finding on whether the officers called

Buckley a liar, we view that more as vigorous questioning than coercion. *See United States v. Hocking*, 860 F.2d 769, 774 (7th Cir.1988) (confession upheld where FBI agents told the defendant they did not believe her); *Haddon*, 927 F.2d at 946 (strong words do not, without more, suggest improper coercion). Although fourteen officers searching a mobile home would be crowded by anyone's definition, it would cause no more intimidation than we found acceptable in *Church*, 970 F.2d at 404, where an armed S.W.A.T. team stormed the house. Numbers were not a factor here anyway. Although many may have been present, only Officers Bates and Pharo spoke with her. Most of the questioning was confined to the small bathroom which would reduce any claimed intimidating by too many police.

Under the totality of the circumstances, we agree with the district court that considering Buckley's characteristics and the manner of the officers' interrogation, the police did not coerce her into cooperating; that she did voluntarily.

### III. Conclusion

For the foregoing reasons, the defendants' convictions and the decision of the district court are AFFIRMED.

---

**5.** Having concluded that the officers did not coerce Herman into cooperating, we need not reach Buckley's argument that she felt resisting the officers would be futile because of the way they unlawfully treated Herman.